UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA,

- v -  **REPORT AND RECOMMENDATION AND ORDER**

BARON CLARKE,

CR-07-776 (ERK)(VVP)

Defendant.
----------------------------------------------------------x

Judge Korman has referred to me the defendant Baron Clarke's pretrial motions to suppress evidence and to compel discovery. Specifically, the defendant seeks to suppress physical evidence seized from him at the time of his arrest, and evidence of various telephonic conversations intercepted through the use of court-authorized wiretaps. He also seeks to compel the government to produce post-arrest statements made by his co-defendants, and hard copies of the transcripts of all of the intercepted conversations in which he participated. For the reasons below, I recommend that the motions to suppress evidence be denied. The motions for discovery are denied.[1]

## BACKGROUND

The charges in this criminal case arise from the government's investigation of various persons employed at John F. Kennedy International Airport ("JFK Airport") concerning the smuggling of narcotics.[2] Certain employees at the airport came to the government's attention through a confidential source who disclosed that they were smuggling narcotics into this country

---

[1]The recommendations on the motions to suppress are issued pursuant to the court's authority under 28 U.S.C. § 636(b)(1)(B). The order deciding the discovery motions is issued pursuant to the court's authority under 28 U.S.C. § 636(b)(1)(A).

[2]The facts concerning the investigation and the charges against the defendant Clarke are taken entirely from the Affidavit of Special Agent Anthony Salisbury of the Department of Homeland Security, Immigration and Customs Enforcement (hereinafter the "Salisbury Aff't"), which was submitted to obtain the warrants for the arrests of Clarke and other alleged coconspirators.

by diverting drug-laden luggage on inbound international flights in such a way as to avoid detection by law enforcement personnel.

Using the confidential source, government agents launched a sting operation in which the confidential source began to negotiate with two allegedly corrupt airport employees to obtain their assistance in smuggling purportedly drug-laden luggage into the country. In the course of several ensuing meetings, the confidential source introduced another confidential source to the employees, and the four of them discussed various aspects of the operation, including the methods that would be used to divert luggage arriving by aircraft and the price that would be charged by the employees for their services. Once the methods of the operation had been sufficiently ironed out, government agents sought and obtained judicial authorization to intercept wire communications occurring over the cellular telephone of one of the corrupt employees, Glenroy Phillips (hereinafter the "Phillips Telephone"), who is one of the other codefendants charged in this action.

With the wiretap in place, one of the confidential sources began to negotiate in earnest with Phillips about the diversion of a specific piece of purportedly drug-laden luggage from an international flight. Through the wiretap, agents learned the identities of several other airport employees who were approached by Phillips to assist in accomplishing the diversion, including the defendant Baron Clarke, and intercepted conversations between Phillips and Clarke concerning the diversion as well. Ultimately the diversion was unsuccessful because the flight carrying the luggage to be diverted was significantly delayed, and when it finally arrived the corrupt employees were unable to reach the luggage before it was unloaded by others. The wiretap continued for several weeks thereafter, however, and agents gathered communications

about other planned diversions involving Phillips and other corrupt employees. In addition, following an airport seizure of a quantity of cocaine unrelated to the sting operation, the wiretap disclosed communications suggesting that one of the corrupt employees was supposed to be involved in the diversion of the luggage carrying those drugs.

On the basis of the evidence developed through the investigation, the government obtained arrest warrants for five of the airport employees alleged to be involved in the scheme, including the defendant Baron Clarke. Pursuant to the warrant for his arrest, Baron Clarke was arrested on September 19, 2007, and various items, including his cellular telephone, were seized from his person at the time of arrest.

## DISCUSSION

The defendant's various motions to suppress evidence and to compel discovery are addressed separately below.[3]

**I.    Motion to Suppress Evidence Seized Upon Arrest**

The defendant seeks to suppress the evidence seized from him at the time of his arrest on the ground that there was no probable cause for his arrest. Recognizing that evidence seized pursuant to an arrest made in good-faith reliance on a facially valid warrant is not subject to suppression even if the warrant is later found to be defective, *see United States v. Leon*, 468 U.S. 897 (1984), the defendant argues further that the warrant was based on an affidavit that was so

---

[3]In support of the motion, the defendant submitted letters dated February 22, 2008 and May 1, 2008. In opposition, the government submitted a letter dated April 4, 2008 with accompanying exhibits. In addition, the government separately submitted copies of the wiretap applications, the supporting affidavits, and the orders issued on the basis of the applications. The court heard oral argument on the motions on May 6, 2008.

patently defective that no agent could have reasonably relied upon it. Def't Letter, May 1, 2008, at 2.

"Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2nd Cir. 1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). The belief need not "be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983). In gauging the existence of probable cause, the court is required to use a "totality-of-the-circumstances" approach rather than any rigid tests. *See Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Probable cause is a "flexible, common-sense standard," and the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Texas v. Brown*, 460 U.S. at 742 (1983) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Viewed with those principles in mind, the affidavit provides ample probable cause for the defendant's arrest. The defendant does not dispute that the affidavit sets forth facts more than sufficient to establish the existence of a conspiracy to import cocaine into the United States. The affidavit details a number of conversations between two confidential sources and two persons employed at JFK Airport, Mickey Phillip and Glenroy Phillips, about how luggage containing narcotics could be unloaded from international flights and diverted to avoid detection by law enforcement officers. See Salisbury Aff't, Sept. 17, 2007, ¶¶ 12-17 (annexed as Ex. A to Gov't Letter in Opposition, Apr. 4, 2008). The conversations included details about the best flights

from which to remove bags (Guyana was preferred), and how much the airport employees were to be paid ($5,000 per diverted bag). *Id*. ¶ 16. The affidavit further asserts that once the wiretap was in place, negotiations continued concerning a specific bag to be diverted that was supposed to arrive on a TravelSpan flight from Trinidad in the early morning hours of July 28, 2007. *Id*. ¶ 20. These facts are sufficient to establish a conspiracy to import narcotics involving at least Mickey Phillip and Glenroy Phillips. The defendant does not contend otherwise.

What defendant does argue is that the affidavit does not provide sufficient evidence that the defendant joined the conspiracy. He argues that the intercepted discussions in which he participated do not show any knowledge of a plan to unload bags with cocaine from any flight, and that his conduct does not display any intention to do anything other than his job – unloading baggage at the airport.

The defendant's arguments overlook several important legal principles. First, "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *United States v. Casamento*, 887 F.2d 1141, 1156-57 (2nd Cir. 1989) (citing *United States v. Ciambrone*, 787 F.2d 799, 806 (2d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986)). Thus, even if a defendant is unaware of various aspects of a conspiracy, he becomes a coconspirator if he has knowledge of a common unlawful endeavor and agrees to join it. *Casamento*, 887 F.2d at 1156-57. In evaluating whether a defendant has joined a conspiracy, the court may consider not only the defendant's own statements and conduct, but the statements of his coconspirators which are made in the course of the conspiracy. *United States v. Persico*, 832 F.2d 705, 715 (2nd Cir. 1987).

The facts set forth in the affidavit concerning the defendant's conduct and statements, coupled with the conduct and statements of his coconspirators, establish probable cause that the defendant had knowledge of an unlawful endeavor and agreed to participate in it. On July 27, 2007, shortly after the confidential source told one of the coconspirators, Glenroy Phillips, about the flight and the purportedly drug-laden bag that was to arrive early the following day from Trinidad, the wiretap intercepted telephone calls between Phillips and two other airport employees involved in baggage handling, including the defendant. Although cryptic, the conversations leave little doubt that they concern the conspiracy, given the context in which they occur. Thus, in the first conversation Phillips speaks with Paulette Drysdale, a baggage room supervisor also alleged to be a member of the conspiracy, to determine whether she has spoken to another employee, referred to as "the brother." She advises him that the employee "said alright." Phillips then asks Drysdale whether he may speak directly to the employee, and Drysdale gives Phillips the employee's telephone number. Salisbury Aff't, ¶ 21. Any fair interpretation of this conversation must include a conclusion that "the brother" to whom Drysdale referred had agreed to aid Phillips and Drysdale in some kind of endeavor.

Immediately after the conversation with Drysdale, Phillips called the telephone number provided by Drysdale and spoke with the defendant Clarke. Phillips introduced himself by saying he got Clarke's number from "P," prompting Clarke to ask whether he was referring to "Paulette." When Phillips confirmed that fact, the two agreed to meet and speak to each other in person. In their discussion concerning the time when they should meet, Clarke inquired whether the time was "three." Responding affirmatively, Phillips sought to get Clarke's confirmation

that he would be available at that time and the two agreed to meet in person before three to speak further.  Salisbury Aff't, ¶ 22.

Even though this conversation between Phillips and the defendant did not expressly refer to the object of the conspiracy, several inferences can be drawn from the discussion that indicate strongly that the defendant knew precisely what the conversation was about.  First, the defendant's immediate recognition that Phillips was referring to Paulette Drysdale when he said he got the defendant's telephone number from "P," and the defendant's agreement to meet with Phillips based on that fact, demonstrates that Clarke had already had a discussion with Drysdale about the plan.  That such a discussion had occurred is further confirmed by Clarke's question to Phillips about whether the time was "three."  As this was the time when the TravelSpan flight was scheduled to arrive, Clarke's comment confirms that he had already obtained information relating to the plan, presumably from Drysdale.  That Phillips and the defendant agreed to meet in person *before* three o'clock provides yet further proof that both of them knew why they were meeting and what they needed to discuss.

The ensuing events, as described in the affidavit, confirm the defendant's knowledge of, and participation in, the conspiracy. Later in the evening of July 27, Phillips spoke to Drysdale again to determine whether she would be working that evening.  When she said she could not come in, Phillips asked her whether the defendant Clarke was "cool," which she emphatically affirmed.  Salisbury Aff't, ¶ 23.  There is little doubt that this conversation concerned whether Clarke could be trusted given the unlawful nature of the shared enterprise.

Then, in the early morning hours of July 28, about a half hour before the TravelSpan flight was scheduled to arrive, Phillips called the defendant to determine where he was,

presumably so they could get together for the pre-arrival meeting. Salisbury Aff't, ¶ 24. The flight was significantly delayed, however, giving rise to another telephone call from Phillips to Clarke at approximately five a.m. again seeking information about where Clarke was. When Clarke told Phillips his location, Phillips told Clarke he would meet him there shortly. Less than an hour later, Phillips telephoned Clarke again to ask whether he could see the TravelSpan flight approaching the gate, to which Clarke replied that he did and that he would go to the gate immediately. Phillips then telephoned the confidential source with the information that the flight had arrived. Salisbury Aff't, ¶¶ 25-26.

Within minutes, Phillips telephoned Clarke again and they exchanged information about their respective locations in relation to the unloading of the TravelSpan flight, indicating that they were both involved in the process. During the conversation, Phillips encouraged Clarke to hurry over to join him because the luggage was already being unloaded. Minutes later Phillips again called Clarke and they discussed whether Clarke's supervisor was "cool." When Clarke said he did not trust her because he did not know her, Phillips suggested that they might have to distract her, and inquired whether Clarke could find some others to assist them. Clarke demurred, explaining that he did not know his coworkers as he had just started to work the shift. During the conversation, Clarke observed that their situation would be "twenty times better" if Drysdale were present. Salisbury Aff't, ¶¶ 27-28. Later in the unloading process, Phillips again called Clarke to inquire whether he had found the bag with "the missing handle," which was the description that had been provided by the confidential source for identifying the bag to be diverted. Salisbury Aff't, ¶ 29. Still later, after learning from the confidential source that the bag

was on the turnstile, Phillips called Clarke yet again to tell him that they had missed the bag. Salisbury Aff't, ¶ 31.

The series of conversations between Phillips and the defendant before, during, and after the arrival of the TravelSpan flight carrying the contraband-laden baggage provide yet further proof that the defendant had knowledge of an unlawful endeavor and had agreed to participate in it. There would be no need for Clarke to meet with Phillips before the arrival of the TravelSpan flight unless there were some special arrangements to discuss. Nor, once the flight had arrived, would there be a need for Phillips to confirm with Clarke that he saw the plane arriving, and for Clarke to assure Phillips that he would go to the arrival gate immediately. These conversations give rise to a fair inference that Clarke and Phillips were working together to accomplish a purpose that required their collaboration, an inference reinforced by Phillips' admonition to Clarke that he hurry to join Phillips when the baggage unloading process got under way. This latter conversation also confirms Clarke's knowledge that the collaboration involved the unloading of baggage, as do the later telephone calls in which Phillips advises Clarke that they had missed the bag since it was on the turnstile. That the defendant knew the endeavor was unlawful is demonstrated by his unwillingness to trust his supervisor, and his reluctance to involve other coworkers since he did not know them. His comment that things would have been much better if Drysdale, who was a supervisor, was present, confirms his participation with Drysdale and Phillips in the entire endeavor.

As the affidavit submitted in support of the government's request for a warrant to arrest Clarke sets forth trustworthy facts that would warrant a person of reasonable caution to conclude

that Clarke had joined the criminal conspiracy, it established probable cause for the arrest. As a result, the items seized from Clarke's person pursuant to the arrest should not be suppressed.

**II.     Motion to Suppress Wiretap Evidence**

The defendant's motion to suppress the evidence obtained from the court-authorized wiretap of Phillips' telephone rests on two independent arguments. He argues first that the wiretap applications to the court were not properly authorized by an official of the Department of Justice. Second, he argues that the wiretap orders were overbroad in that they permitted telephone calls to be intercepted no matter where the Phillips Telephone was being used, and required the telephone company to provide information concerning the contents of telephone calls made on telephones other than the Phillips Telephone. Neither argument has merit.

A.     *The Justice Department Authorizations*

The defendant's first argument is based on the requirement, found in section 2516(1) of title 18, United States Code, that every request for a wiretap order must be authorized by one of several specially designated officials of the Department of Justice ("DOJ"). Such authorizations accompanied both applications for the wiretap orders here. The defendant argues, however, that the authorizations were not sufficient because they were signed by DOJ officials other than the putative author listed at the beginning of the authorizing memorandums, and because the signatures might be stamped rather than original.

As to the two officials who signed the authorizations, Deputy Assistant Attorney General John C. Keeney and Acting Deputy Assistant Attorney General John Roth, the government has provided an order of the former Attorney General, Alberto Gonzalez, which was in effect at the time of the wiretap authorizations here and which designated any Deputy Assistant Attorney

General and any Acting Deputy Assistant Attorney General of the Criminal Division of the Department of Justice to authorize wiretap applications. Gov't Letter, April 4, 2008, Ex. B. The statute specifically permits the Attorney General to designate officials of that rank to authorize wiretap applications. *See* 18 U.S.C. § 2516(1). As to whether the signatures were stamped, rather than original, there is nothing in the statute that requires the signature to be an original signature. *See generally* 18 U.S.C. § 2516. In any event, the Assistant United States Attorney here has asserted in open court that he spoke to an official at the Justice Department who confirmed, after reviewing the original documents, that the signatures were original and not stamped.[4] The court is satisfied that the authorizations of the Justice Department met the statutory requirements.

B. *The Claimed Overbreadth of the Wiretap Orders*

As noted above, the defendant contends that the wiretap orders issued here were overbroad because they authorized interceptions to occur outside the territorial boundaries of the Eastern District of New York, and because they authorized agents to obtain information, including the contents of communications, relating to telephones other than the Phillips Telephone.

---

[4]The DOJ authorizations had been transmitted to the United States Attorney here by facsimile and thus were photocopies of the original documents. The defendant contends that the government has a burden to produce affidavits from the signers of the authorizations attesting under oath that their signatures were not "rubber-stamped" and that they conducted a proper review of the applications. The cases cited for those propositions impose no such requirements. *See United States v. Giordano*, 496 U.S. 505 (1974); *United States v. Chavez*, 416 U.S. 562 (1974). In the absence of some showing of irregularity in the authorizations, a showing not made by the defendant here, there is no basis for requiring DOJ officials to submit affidavits attesting to their signatures or for exploring the propriety of the review process by which authorization decisions were made.

1. <u>Interceptions Outside the Judicial District</u>

The defendant contends that the wiretap orders entered by the court violated section 2518(3) of title 18, United States Code, by authorizing "interception . . . in any other jurisdiction within the United States." Order of Authorization, July 25, 2007, at p. 7; Order of Authorization, Aug. 25, 2007, at p. 7. This, the defendant argues, conflicts with the statute because the statute permits interception outside the district of the authorizing court only "in the case of a mobile interception device authorized by a Federal court within such jurisdiction." 18 U.S.C. § 2518(3). Since the wiretap orders here did not specifically authorize the use of a "mobile interception device," the defendant contends that the orders authorizing interception outside the territorial jurisdiction of the court were unlawfully overbroad.

The short answer to the defendant's argument is that, whatever the order may have authorized with respect to extraterritorial interceptions, no interceptions actually occurred outside the territorial jurisdiction of the court. Under Second Circuit jurisprudence, "a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard." *United States v. Rodriguez*, 968 F.2d 130, 136 (2nd Cir. 1992). Here, there is no dispute that the tapped phone remained within the Eastern District of New York while it was being tapped, and that the agents intercepting the communications on the telephone were likewise located in the Eastern District of New York. Thus, even accepting the defendant's argument that the court overstepped its bounds in authorizing interceptions that it had no jurisdiction to authorize, the government did not use any such unlawful authority to gather evidence here.

The purpose of exclusionary rules is to deter overzealous government agents from overstepping the bounds of the Constitution in gathering evidence. *See, e.g., Stone v. Powell*, 428 U.S. 465, 482-84 (1976); *United States v. Calandra*, 414 U.S. 338, 347 (1974) ("the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures"). It follows, then, that where, as here, there has been no unlawful police conduct to deter, there is no basis for applying the exclusionary rule to suppress lawfully obtained evidence.

The defendant cites three cases for the proposition that all evidence obtained as a result of the execution of a facially overbroad warrant must be suppressed. The cases are all inapposite. Two dealt with search warrants that failed to describe with sufficient particularity the items to be seized, thus permitting the seizing agents to conduct general searches with essentially unfettered discretion in choosing what to seize. *See United States v. Cardwell*, 680 F.2d 75, 77-78 (9th Cir. 1982) and *United States v. Gardner*, 537 F.2d 861, 862 (6th Cir. 1976). The wiretap warrants here do not suffer from the same lack of particularity as to the evidence the agents were authorized to obtain, and the defendant does not contend otherwise.

The third case, *United States v. Marcus*, 807 F. Supp. 934 (E.D.N.Y. 1992) (Korman, J.), dealt with a more attenuated issue, the use of statements made by a defendant following a search pursuant to an overbroad warrant. The warrant at issue permitted the agents to search for various specifically described items, but was defective because the search for some of the items was not adequately supported by probable cause to believe they were located at the premises. Although the court in *Marcus* ultimately concluded that the statements were the excludable "fruit of a poisonous tree" because of the overbreadth of the warrant, the *Marcus* decision actually

-13-

undercuts the defendant's position here.  In reaching its decision, the court recognized and applied the Second Circuit's decision in *United States v. George*, 975 F.2d 72 (2nd Cir. 1992), which held that not all evidence seized pursuant to a partially overbroad warrant is excludable.  In other words, a warrant's overbreadth is not necessarily fatal to the entire warrant.  Rather, where only a portion of a warrant is invalid, properly seized evidence is nevertheless admissible.  *Id*., 975 F.2d at 79.  Thus, applying *George* and *Marcus* to the situation here the court would be justified in suppressing only those interceptions that took place outside of the territorial jurisdiction of the court, while permitting the use of interceptions that occurred within the district.  Since the interceptions here all occurred within the district, the *George* and *Marcus* decisions support their admissibility regardless of whether the warrant unlawfully authorized extraterritorial interceptions.

### 2. Interceptions of Content

The second overbreadth argument made by the defendant pertains to that portion of the wiretap warrants which permitted the agents to obtain information about telephones other than the telephone to which the wiretap authorization applied.  In addition to authorizing the interception of communications over the Phillips Telephone, the court orders here permitted agents to obtain information about telephones that were in contact with the Phillips Telephone.  Thus, the orders of authorization directed various communications service providers to disclose to government agents "all published and non-published subscriber information and toll records and information relevant and material to this investigation."  Order of Authorization, July 25, 2007, at p.8; Order of Authorization, Aug. 24, 2007, at p.8.  Similar directions were included in separate orders issued to various service providers which required them to disclose to

government agents "all published and non-published subscriber information associated with telephones, digital display paging devices, and mobile telephones that contact the [Phillips Telephone]." Order to Service Provider, July 25, 2007, at p.5; Order to Service Provider, Aug. 24, 2007, at p.5.

Courts are authorized to issue such orders pursuant to section 2703(c)(1)(B) of title 18, United States Code, which permits agents to obtain a court order requiring an electronic communication service to disclose "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)." The defendant argues, however, that since the orders issued by the court here did not expressly exclude "contents of communications" from the scope of information the service providers were required to disclose, the orders were overbroad and all information obtained as a result of the orders must be suppressed.

This argument suffers from the same defects as the defendant's other overbreadth argument: the government neither sought, nor obtained, the contents of any communications other than those intercepted from the Phillips Telephone. The mere possibility that the order could have been misused by the agents to obtain the contents of communications occurring over other telephones does not justify invocation of an exclusionary rule where no such misuse actually occurred. Thus, as no unlawful police conduct occurred here, there is no conduct to deter in the future and no purpose would be served by applying the exclusionary rule to suppress validly obtained evidence.[5]

---

[5]The defendant also argues that the government did not meet the requirements for issuance of an order under section 2703(c)(1)(B) because the application for the order did not offer "specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

**III.    Motion to Compel Production of Codefendants' Post-Arrest Statements**

The defendant seeks to compel the government to produce any post-arrest statements made by his co-defendants. Rule 16 of the Federal Rules of Criminal Procedure does not require the production of such information.[6] The defendant nevertheless argues first that he needs the statements to enable him to make pre-trial motions to suppress them or to sever his trial from that of his codefendants. Alternatively, he argues that the statements may enable him to move to dismiss the indictment on the ground that it may provide evidence of multiple conspiracies rather than the single conspiracy charged in the indictment.

As to the potential motions to suppress or to sever, the government recognizes the constraints on the use of a defendant's post-arrest, inculpating statements at a trial involving multiple codefendants, as identified in *Bruton v. United States*, 391 U.S. 123 (1968) and its progeny. To the extent that any codefendants who gave such statements do not plead guilty, the government has agreed to provide the substance of any such statements they intend to use at trial in advance of the trial for inspection and appropriate redaction to avoid *Bruton* problems. That procedure is sufficient, and an order requiring disclosure now is therefore not necessary.

As to a potential motion to dismiss the indictment on the ground of multiple conspiracies, the defendant provides no authority for such a motion and no explanation for how the

---

In support of this argument, the defendant contends that the applications only discuss the use of the Phillips Telephone in connection with the criminal activities under investigation. It is self-evident, of course, that the use of the Phillips Telephone necessarily involved other telephones and communications devices with which the Phillips Telephone was in contact. It is therefore reasonable to believe that records concerning those other telephones and communications devices would be relevant and material to the criminal investigation discussed in great detail, and about which numerous "specific and articulable facts" are disclosed, in the wiretap applications.

[6]Rule 16 specifically exempts from pre-trial disclosure "the discovery or inspection of statements made by prospective government witnesses." Fed. R. Crim. P. 16(a)(2).

codefendants' post-arrest statements would potentially assist such a motion. The defendant does cite *Kotteakos v. United States*, 328 U.S. 750 (1946), a case which examined the issue of single versus multiple conspiracies, but not in the context of a motion to dismiss an indictment. Rather, that case involved a variance in proof at a trial where the indictment charged a single conspiracy, but where the proof established as many as eight separate conspiracies. 328 U.S. at 754-55. Concluding that the variance was fatal, and not merely harmless error, the Court in *Kotteakos* reversed the conviction.

The *Kotteakos* decision provides no support, however, for the notion that the potential for a variance of proof at trial serves as grounds for dismissing an indictment before trial. Rather, the decision rested on an examination of the proof actually offered at the trial, and was essentially a finding that the government failed to meet its burden of proving the charge in the indictment. Such a decision can only be made after the presentation of the government's case at trial, and thus does not lend itself to a pretrial motion to dismiss an indictment.

As the defendant has not offered any convincing argument for requiring disclosure of the codefendants' post-arrest statements at this time, the motion to compel the government to produce the statements is denied.

## IV. Motion to Compel Production of Transcripts of Wiretap Conversations

The defendant seeks to compel the government to produce hard copies of transcripts of the intercepted conversations containing his voice. The government has provided the defendant with a compact disc ("CD") that contains audio recordings of all of the conversations intercepted during the investigation (both by wiretap and by consensual monitoring), as well as drafts of the transcripts of those conversations that have been transcribed thus far. The government has also

provided the defendant's counsel with assistance in identifying and obtaining information from the CD. Complaining that he is not sophisticated enough in the use of computers to efficiently obtain information from the CD, the defendant's counsel nevertheless seeks to have the government perform the additional task of identifying those conversations on the CD involving his client, and either print out the draft transcripts of those conversations or provide a numbered code by which they can be retrieved from the CD. The government is reluctant to do so for fear that it will overlook conversations that contain the defendant's voice because they failed to recognize it, and be later accused of having misled the defendant from using conversations that would assist in his defense.

The government has satisfied its discovery obligations by providing the defendant with the CD. The government has no obligation to identify for the defendant and his counsel those conversations on the CD that include the defendant. As the defendant is undoubtedly in the best position to identify his own voice and the conversations in which he participated, it is up to the defendant and his counsel to review the CD to locate all the conversations in which he participated. The government has indicated its continued willingness to assist them in learning how to retrieve information from the CD. To further assist them, however, the government is directed to provide hard copies of all of the draft transcripts that appear on the CD, not simply those that the government believes contain conversations in which the defendant Clarke participated.[7]

---

[7]As confirmed during oral argument, the government will produce final transcripts of those conversations it will seek to introduce in evidence sufficiently in advance of trial to permit the defendant to review them for accuracy.

## CONCLUSION

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be denied. In addition, the defendant's motions concerning discovery are denied.

\*         \*         \*         \*         \*         \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2nd Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2nd Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2nd Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:    Brooklyn, New York
          May 28, 2008